## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO.

ROBERT STRICKLAND, NICOLE MASTERS,
LATASHA JACKSON, JOHN C. SEKULA,
and JACQUELINE SEKULA on behalf
of themselves and all others similarly situated,

                  Plaintiffs,                         **CLASS ACTION**

v.                                           **JURY DEMAND**

CARRINGTON MORTGAGE SERVICES, LLC,
CARRINGTON MORTGAGE HOLDINGS, LLC,
CARRINGTON HOLDING COMPANY, LLC,
FAY SERVICING, LLC, AMERICAN MODERN
HOME INSURANCE COMPANY, AMERICAN
WESTERN HOME INSURANCE
COMPANY and SOUTHWEST BUSINESS CORPORATION,

                  Defendants.
_____/

## CLASS ACTION COMPLAINT

Plaintiffs Robert Strickland, Nicole Masters, Latasha Jackson, and John and Jacqueline Sekula[1] file this class action complaint, on behalf of themselves and all others similarly situated, against Defendants Carrington Mortgage Services, LLC ("CMS"), Carrington Mortgage Holdings, LLC, Carrington Holding Company, LLC,[2] Fay Servicing, LLC ("Fay"), American Modern Home Insurance Company ("AMIC"), American Western Home Insurance Company ("American

---

[1] Plaintiffs Strickland, and Masters are bringing claims against Carrington and American Modern, Plaintiff Jackson brings claims against Fay Servicing and American Modern, and the Sekula Plaintiffs bring claims against only American Modern on behalf of a class of borrowers serviced by Residential Credit Solutions ("RCS").

[2] Carrington Mortgage Services, LLC ("CMS"), Carrington Mortgage Holdings, LLC, and Carrington Holding Company, LLC shall be collectively referred to as "Carrington."

Western"),[3] and Southwest Business Corporation ("Southwest") (collectively "Defendants").

## NATURE OF THE CASE

1.      Plaintiffs file this class action complaint to redress the wrongful conduct of Carrington, Fay, American Modern, and Southwest in manipulating the force-placed insurance market through collusive agreements involving kickback arrangements and other forms of improper compensation.  Plaintiffs and proposed nationwide classes of Carrington, Fay, and RCS borrowers seek to recover damages they have suffered as a direct result of Defendants' standard practice of charging borrowers undisclosed, unauthorized, and illegitimate costs in connection with force-placed insurance.

2.      Defendants engaged in a pattern of unlawful and unconscionable profiteering and self-dealing in their purchase and placement of force-placed insurance coverage throughout the country and in Florida.  In exchange for providing American Modern and Southwest with the exclusive right to monitor their entire loan portfolio and force-place their own insurance coverage, American Modern provided Carrington, Fay, and RCS with various kickbacks that Defendants masquerade as legitimate compensation.

3.      These kickbacks include but are not limited to payments disguised as one or more of the following: (1) "commissions" paid to the mortgage servicer or an affiliate for work purportedly performed to procure individual policies; (2) "expense reimbursements" allegedly paid to reimburse the mortgage servicer for expenses it incurred in the placement of force-placed insurance coverage on homeowners; (3) reinsurance premiums that, in fact, carry no commensurate transfer of risk; and (4) payments for mortgage-servicing functions that Southwest and American Modern perform for the mortgage servicers that, in fact, are made below-cost and

---

[3] American Modern Home Insurance Company ("AMIC") and American Western Home Insurance Company ("American Western") shall be collectively referred to as "American Modern."

2

often have nothing to do with the placement of insurance coverage.

4.      Because of these kickbacks, all of which are entirely gratuitous and unearned, the mortgage servicers (like Fay and Carrington, here) receive a rebate on the cost of the force-placed insurance.  Homeowners, however, ultimately bear the cost of these kickbacks because Defendants do not pass on these rebates to the borrower. The charges for force-placed insurance are deducted from borrowers' escrow accounts and Defendants attempt to disguise the kickbacks as legitimate when, in fact, they are unearned, unlawful profits.

5.      Carrington, American Modern, and SWBC knew that state and federal regulators were investigating these force placed insurance practices and the kickbacks circulated between the companies involved.  These particular Defendants developed a scheme whereby they attempt to skirt regulations by developing a kickback structure that paid Carrington a lump sum payment up front and then Carrington would transfer its rights to future kickbacks and commissions to Southwest.  A public Offering Circular from Carrington Holding Company illustrated the scheme as follows:

> ***We may be subject to significant losses relating to refunds from our insurance referral program or sale of our insurance business.***
>
> Certain regulators, including the New York State Department of Financial Services, have undertaken investigations into the business of lender placed insurance, also known as "force-placed insurance".  Specifically, these regulators have taken the position that where a loan servicer imposes a force placed policy, and the force placed insurance provider pays a commission to an insurance agency affiliated with the servicer imposing the policy, such commission may constitute an improper "kickback". Should any regulator decide to take action, we may be forced to pay restitution, potentially including the return all or a portion of the pre-paid fees paid to us by obligors under forced-place insurance policies. In addition, in connection with the sale of our insurance agency business, we may be required to refund to the purchaser up to $18,994,510, as of September 30, 2013, of the consideration received from such sale if target levels of net written premiums are not produced within specified periods. Please see "*Management's Discussion and Analysis of Financial Condition and Results of Operations—Contractual Obligations*."

*See* Offering Circular dated December 31, 2013 from Carrington Holding Company at 44.

3

6.    Carrington deemed this as deferred revenue in its Financial Statements.

**14. DEFERRED REVENUE**

Effective November 28, 2012, Carrington Insurance Agency, LLC ("CIA"), formerly known as Telsi Insurance Agency, LLC, entered into a contract to transfer their rights, title and interests to insurance commissions placed on or after the aforementioned effective date. The contract stipulates a minimum required production of $125.0 million in policies placed by CIA at a commission rate of 17%, in exchange for $21.25 million in cash paid to CIA on the effective date. CIA recorded the cash received as deferred revenue which is earned as new policies are placed by CIA. The deferred revenue amount in the accompanying consolidated statements of financial condition was approximately $19.0 million at September 30, 2013 (unaudited) and $21.2 million at December 31, 2012, respectively.

*See* Carrington Holding Company, LLC and Subsidiaries Consolidated Financial Statements dated September 30, 2013 at 31.

7.    This scheme, hereinafter referred to as the "Carrington Kickback," allowed Carrington to continue to levy inflated force-placed insurance charges on borrowers while the regulators were closing in.

8.    This action seeks to redress for injuries resulting directly from Defendants' force-placed insurance practices.  Plaintiffs do ***not*** challenge the mortgage servicers' contractual right to obtain force-placed insurance to protect its interest in Plaintiffs' loan nor do they challenge the insurance rates filed by American Modern; they instead challenge the manner in which Defendants have manipulated the force-placed insurance process to enrich themselves at the expense of Plaintiffs and the Class, and in violation of the mortgage agreements.

9.    All mortgage lenders' force-placed insurance schemes operate in a materially similar fashion.  When a homeowner's voluntary insurance policy lapses, the mortgage servicer force-places insurance on the property and charges the borrower inflated amounts.  Borrowers are told they will be charged the cost of coverage and contract to do so, but in fact pay an amount greater than what the mortgage servicer, here Carrington and Fay, ultimately pay for the force-

4

placed insurance.  This is because after the servicer pays the insurer for the force-placed coverage, the insurer, American Modern here, kicks back a percentage of the payment, through Southwest, to the servicer or one of its affiliates.  The kickback provides the servicer a rebate, and thus reduces the cost of insurance coverage.   The benefit of that rebate is not, however, passed on to the borrower.

10.     The amounts charged to borrowers for forced coverage beyond the cost of coverage are disguised as legitimate charges related to the procurement and provision of new coverage. These kickbacks, which are described in greater detail below, not only allow the insurer to secure an exclusive relationship with the mortgage lender or servicer and keep the market closed, but also provide the participants in the scheme with millions of dollars in ill-gotten gains—all at borrowers' expense.

11.     In reality, the amounts charged to the borrowers for forced coverage have little or nothing to do with the risk insured or the value of the property, and are purely a function of this kickback scheme. This action seeks compensation for borrowers who have been victimized by this practice and an end to this illegal scheme.

12.     At all relevant times, Carrington, Fay, and RCS purchased force-placed insurance exclusively from American Modern pursuant to a longstanding agreement whereby American Modern provided coverage for the entire portfolio of mortgage loans under a master policy. Southwest facilitates the arrangement by performing mortgage servicer functions at below cost, including tracking the loans in the mortgage portfolio for lapses in insurance, and notifying American Modern of any lapse so a certificate can be issued under the master policy.

13.     Defendants' arrangement returns a significant financial benefit to the mortgage servicers and their affiliates that is unrelated to any contractual or bona fide interest in protecting their interest in the loan.  Pursuant to their agreements, the mortgage servicers purchase high priced

5

force-placed insurance coverage from American Modern, and in exchange receive kickbacks from American Modern and Southwest in the form of unearned "commissions," ceded premiums for riskless reinsurance, subsidies for below-cost mortgage servicing functions (that often have nothing to do with providing insurance coverage), or illusory "expense reimbursements," among other things that amount to a rebate on the cost to the mortgage servicers.

14.      As described above, Carrington devised another form of a kickback and has already been paid the Carrington Kickback of almost $19 million in advance for these commissions, and Carrington must guarantee a certain level of force placed insurance charges per year in order to keep its pre-payment.

15.      The mortgage servicers impose charges on borrowers in amounts purported to represent the cost of insurance paid for, but which are, in fact, greater than what the mortgage servicers paid because the charges include the gratuitous kickbacks that American Modern and Southwest remit to them that amount to a rebate not passed on to borrowers.

16.      The mortgage servicers' desire to reap greater profits through the prearranged agreements with Southwest and American Modern, and American Modern's willingness to participate in this scheme, incentivizes the selection of American Modern as the exclusive force-placed insurer.  The charges imposed on borrowers, which the mortgage servicers attribute to the cost of the insurance, are not only greater than the actual cost of providing the insurance and the actual cost paid by Fay, Carrington, or RCS, but also are usually far greater than the premium for the borrowers' voluntary insurance, even though the force-placed insurance typically provides less coverage.  Through this manipulation of the force-placed insurance selection process, Defendants maximize their own profits to the detriment of Plaintiffs and the Class members.

**PARTIES**

17.      Plaintiffs Robert Strickland and Nicole Masters were charged for force-placed

10C5717

insurance on their home in Polk City, Florida by Defendant Carrington.  Pursuant to their exclusive arrangement and the master policy in place, Carrington purchased the force-placed insurance coverage from AMIC in 2014.  Plaintiffs Strickland and Masters are citizens of the State of Florida, reside at 4225 Portage Drive, Polk City, Florida 33868 and are otherwise *sui juris*.

18.     Plaintiffs John and Jacqueline Sekula were charged for force-placed insurance on their home in Sanford, Florida by RCS.  RCS purchased the force-placed insurance coverage from American Western. The Sekula Plaintiffs are citizens of the State of Florida.

19.     Plaintiff Latasha Jackson was charged for force-placed insurance on her home in Mississippi by Defendant Fay.  Pursuant to their exclusive arrangement and the master policy in place, Fay purchased the force-placed insurance coverage from American Modern in 2015  Ms. Jackson is a citizen of the State of Mississippi and resides at 4309 Old Mobile Hwy, Pascagoula, Mississippi 39581.

20.     CMS is a Delaware limited liability company with its principal place of business in Anaheim, California.  CMS is wholly owned by Carrington Mortgage Holdings, LLC, a Delaware Limited Liability Company.  Carrington Mortgage Holdings, LLC is a Delaware limited liability company that is 99.5% owned by Carrington Holding Company, LLC.  Carrington Holding Company, LLC is a Delaware limited liability company that is wholly owned by The Carrington Companies, LLC. Therefore, CMS, Carrington Mortgage Holdings, LLC, and Carrington Holding Company, LLC are citizens of the State of Delaware.  Carrington services residential mortgage loans in Florida and throughout the United States, including loans within this district.  Carrington serviced the Strickland and Masters Plaintiffs' loans.

21.     American Modern Home Insurance Company ("AMIC") and American Western Home Insurance Company ("American Western") are subsidiaries of American Modern Insurance Group, Inc. and write force-placed insurance commercial policies throughout the United States,

including within this district.  AMIC and American Western are Ohio corporations with their principal office at 7000 Midland Blvd., Amelia, Ohio 45102.  Therefore AMIC and American Western are citizens of Ohio.

22.     Defendant Southwest Business Corporation ("Southwest") is a privately held financial services company based in San Antonio, Texas. Southwest is a citizen of Texas.  It provides insurance, mortgage, and investment services to financial institutions, businesses, and individuals and is licensed to do business in all fifty U.S. states. Southwest contracts with servicers and lenders to act as a force-placed insurance vendor.  During the relevant time periods described in this Complaint, Southwest contracted as a force-placed insurance vendor with Carrington.  Upon information and belief, Southwest, along with American Modern, tracks loans in Carrington's mortgage portfolio, handles customer service duties related to force-place insurance, and issues certificates from the force-placed insurance master policy on properties when a borrower's insurance has lapsed.  At all relevant times described in this complaint, Southwest was acting as an agent, servant, employee, partner, and joint venturer of Defendants Carrington and American Modern.  Southwest had actual or constructive knowledge of the acts of each of these Defendants, and ratified, approved, joined in, acquiesced in, or authorized the wrongful acts of each co-defendant, and retained the benefits of said wrongful acts.  Southwest was a direct, necessary, and substantial participant in the common course of conduct complained of herein, and was aware of its overall contribution to and furtherance of the conspiracy and common course of conduct. Southwest conducts business throughout the United States, including Florida.  Southwest is a Texas corporation with its principal office at 9311 San Pedro Avenue, Suite 600, San Antonio, Texas 78216.

## The Force-Placed Insurance Industry

23.     Lenders and mortgage servicers force-place insurance coverage when a borrower

fails to obtain or maintain proper hazard, flood, or wind insurance coverage on property that secures a loan.  Under the typical mortgage agreement, if the insurance policy lapses or provides insufficient coverage, the lender has the right to force-place coverage on the property to protect its interest in the loan and to charge the borrower the cost of coverage.

24.     Force-placed insurance schemes, like the ones at issue here, take advantage of the discretion afforded to the lenders and servicers in standard form mortgage agreements.  The mortgage agreements typically require the borrower to carry hazard insurance sufficient to cover the lender's interest in the property against fire and other perils.  If a homeowner's "voluntary" policy lapses, the mortgage agreement allows the lender to "force place" a new policy on the property at the borrower's expense.

25.     These schemes also violate the mortgage contract's express terms.  The borrower contracts to compensate the servicer for the actual cost that the servicer pays the insurer for the forced coverage, but is then charged an inflated amount – more than the lender or servicer actually paid.

26.     Force-placed insurance providers, like American Modern here, enter into exclusive relationships with mortgage lenders and servicers to provide the force-placed policies.   To maintain their exclusive relationships with these lenders and servicers, the force-placed insurers, using an insurance agency like Southwest as a conduit, pay them unearned "kickbacks," often as a percentage of the force-placed premiums that mortgage lenders and servicers pay; together with Southwest offer subsidized mortgage servicing functions; enter into lucrative captive reinsurance deals with them; and/or provide other financial benefits not attributable to the cost of insuring the property.

27.     The money to finance these force-placed insurance schemes comes from unsuspecting borrowers who are charged inflated amounts for force-placed insurance by lenders

10C5717

or servicers.  Borrowers are required to pay the full amount that the lender or servicer initially pays to the insurer despite the fact that a considerable portion of that amount is kicked back to the lender or servicer in the manner described above.  Fay, Carrington, and RCS get the benefit of an effective rebate from American Modern and Southwest that is not passed on to the borrower.  Instead borrowers are charged the full amount, purportedly for the cost of insurance coverage.  Lenders and servicers, and their exclusive force-placed insurers, reap these unconscionable profits entirely at the expense of the unsuspecting borrowers.

28.     During a 2012 hearing on force-placed insurance at the National Association of Insurance Commissioners ("NAIC"), Mr. Birny Birnbaum, an expert on the force-placed insurance market, illustrated the staggering growth in profits that force-placed insurance schemes have reaped in recent years:[4]

**LPI Premiums Have Quadrupled Since 2004**

| Year | Gross Written Premium ($ Millions) | Net Written Premium ($ Millions) |
|---|---|---|
| 2004 | $1,485 | $796 |
| 2005 | $1,832 | $919 |
| 2006 | $2,163 | $1,074 |
| 2007 | $3,058 | $1,647 |
| 2008 | $4,000 | $2,209 |
| 2009 | $5,181 | $3,049 |
| 2010 | $5,915 | $3,223 |
| 2011 | $5,692 | $3,450 |
| 2004-2011 | $29,326 | $16,368 |

2009-2011 GWP Understated, Reporting Errors by QBE

CEJ LPI Presentation to NAIC                     13                          August 9, 2012

29.     It is no surprise that these practices have come under increased scrutiny in recent years by the government and regulators:

- At hearings before the New York Department of Financial Services ("NYDFS") on May 17, 2012 related to the force-placed insurance market,

---

[4] This graph is from Mr. Birnbaum's presentation to the NAIC on August 9, 2012.  The presentation is available at:     http://www.naic.org/documents/committees_c_120809-public_hearing_lender_placed-insurancepresentation_birnbaum.pdf.

the Superintendent of Financial Services, Benjamin Lawsky, stated that the Department's initial inquiry uncovered "serious concerns and red flags" which included: 1) exponentially higher premiums, 2) extraordinarily low loss ratios, 3) lack of competition in the market, and 4) tight relationships between the banks, their subsidiaries, and insurers.  He went on to state:

> In sum when you combine [the] close and intricate web of relationships between the banks and insurance companies on the one hand, with high premiums, low loss ratios, and lack of competition on the other hand, it raises serious questions . . . .

- The Consumer Financial Protection Bureau's regulations on force-placed insurance became final on January 17, 2013 and prohibit servicers of federally regulated mortgage loans from force-placing insurance unless the servicer has a reasonable basis to the believe the borrower's insurance has lapsed and require the servicer to provide three notices of the force-placement in advance of issuing the certificate of insurance.[5]

- On December 18, 2013, Fannie Mae issued its Servicing Guide Announcement related to force-placed insurance that, among other things, prohibits servicers from including any commissions, bonuses, or other incentive compensation in the amounts charged to borrowers for force-placed insurance and further requires that the force-placed insurance carrier cannot be an affiliated entity of the servicer.[6]

30.    In New York, as a result of the NYDFS hearings, American Modern entered into a

Consent Order:

> In October 2011, DFS launched an investigation into the force-placed insurance industry. Force-placed insurance is insurance taken out by a bank, lender, or mortgage servicer when a borrower does not maintain the insurance required by the terms of the mortgage. This can occur if the homeowner allows their policy to lapse (often due to financial hardship), if the bank or mortgage servicer determines that the borrower does not have a sufficient amount of coverage, or if the homeowner is force-placed erroneously.

---

[5] *See* Consumer Financial Protection Bureau Proposes Rules to Protect Mortgage Borrowers" available at http://www.consumerfinance.gov/pressreleases/consumer-financial-protection-bureau-proposes-rules-to-protect-mortgage-borrowers/

[6] *See* https://www.fanniemae.com/content/announcement/svc1327.pdf

10C5717

DFS's investigation revealed that the premiums charged to homeowners for force-placed insurance can be two to ten times higher than premiums for voluntary insurance -- despite the fact that force-placed insurance provides far less protection for homeowners than voluntary insurance. Indeed, even though banks and servicers are the ones who choose which force-placed insurance policy to purchase, the high premiums are ultimately charged to homeowners, and, in the event of foreclosure, the costs are passed onto investors. And when the mortgage is owned or backed by a government-sponsored enterprise, such as Fannie Mae or Freddie Mac, those costs are ultimately borne by taxpayers.

DFS's investigation revealed that certain force-placed insurers competed for business from the banks and mortgage servicers through what is known as "reverse competition." That is, rather than competing by offering lower prices, the insurers competed by offering what is effectively a share in the profits. This profit sharing pushed up the price of force-placed insurance by creating incentives for banks and mortgage servicers to buy force-placed insurance with high premiums. That's because the higher the premiums, the more that the insurers paid to the banks. This troubling web of kick-backs and payoffs at certain force-placed insurers helped push premiums sky-high for many homeowners.

**Agreement[] with American Modern Insurance … .**

The settlement DFS reached today with American Modern Insurance includes restitution for homeowners, a $1 million penalty paid to the State of New York, and a requirement that the company implement the Cuomo Administration's nation-leading force-placed insurance reforms. American Modern will also be required to lower its premium rates going forward, providing significant savings to homeowners, taxpayers, and investors.[7]

31.     The NYDFS 2013 Consent Order[8] also required American Modern to make certain

business practice changes, including but not limited to:

   a.  Not issuing force-placed insurance on mortgaged property serviced by a bank or servicer affiliated with the insurers.

   b.  Not paying commissions to a bank or servicer or a person or entity affiliated with a bank or servicer on force-placed insurance policies obtained by the servicer.

   c.  Not reinsuring force-placed insurance policies with a person or entity affiliated with the banks or servicer that obtained the policies.

---

[7] *See* http://www.dfs.ny.gov/about/press/pr1305301.htm

[8] http://www.dfs.ny.gov/about/letters/130530-amer-mod.pdf

10C5717

d. Not paying contingent commissions based on underwriting profitability or loss ratios.

e. Not providing free or below-cost, outsourced services to banks, servicers or their affiliates.

f. Not making any payments, including but not limited to the payment of expenses, to servicers, lenders, or their affiliates in connection with securing business.

32.     In April 2015, American Modern and related entities entered into a Regulatory Settlement Agreement ("RSA") with the insurance departments of fifty states and the District of Columbia which revealed that its force-placed insurance operations were rife with problems.  It agreed to an administrative penalty of not less than $6 million allocated to various States.  The administrative penalty could be as much as $24 million if American Modern fails to implement corrective actions under the agreement.  It also agreed that the lead states under the RSA, Ohio, Indiana and Washington, would conduct an examination of American Modern, commencing on or after April 1, 2016, of all force-placed policies covered by the RSA with an effective date on or after January 1, 2016.  American Modern announced it was exiting the force-placed insurance business on February 22, 2016.[9]

33.     In September 2015, American Modern, and other related entities, entered into a Consent Order[10] with the Florida Office of Insurance Regulation ("FLOIR") after FLOIR discovered massive issues with American Modern's lender place insurance program, including but not limited to the following:

a. not using the filed and approved rates when it charged servicers (who then passed on those charges to borrowers) for FPI;

---

[9] http://www.prnewswire.com/news-releases/american-modern-insurance-group-announces-exit-from-lender-placed-insurance-business-300224011.html

[10]http://www.floir.com/siteDocuments/American_Modern_Insurance_Group_Inc%20_Consent_Order_174210-15-CO.pdf

10C5717

    b.   misapplied discounts, credits, surcharges, failed to limit Individual Risk Premium Modification rating to filed limits, which resulted in overcharges and undercharge;

    c.   failed to maintain documentation supporting scheduled rate modifications;

    d.   exceeded the 25% maximum credit or debit permitted in a scheduled rating plan; and

    e.   failed to maintain records and accurate financial reports.

34.    The FLOIR Consent Order prohibited American Modern from engaging in the following practices:

    a.   Paying commissions to a bank or servicer or a person or entity affiliated with a bank or servicer on force-placed insurance policies obtained by the servicer;
    b.   Issuing force-placed insurance on mortgaged property serviced by a bank or servicer affiliated with American Modern;

    c.   Reinsuring force-placed insurance policies with a captive insurer of any Servicer;

    d.   Paying contingent commissions based on underwriting profitability or loss ratios to any Servicer or person or entity affiliated with a Servicer;

    e.   Providing free or below-cost, outsourced services to servicers or their affiliates; and

    f.   Making any incentive payments, including but not limited to the payment of expenses, to servicers or their affiliates in connection with securing business.

35.    Defendants' self-dealing and collusion in the force-placed insurance market has caused substantial harm to the named Plaintiffs and the proposed classes they seek to represent. This class action seeks to redress that harm on behalf of these classes of consumers and to recover all improper costs they have incurred related to the forced placement of insurance by the Defendants.

## JURISDICTION AND VENUE

36.    This Court has subject-matter jurisdiction over this action because Plaintiffs' claims arise under the federal Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(d), according to the statute's jurisdictional statement, 18 U.S.C. § 1964.  Further, pursuant

10C5717

to 28 U.S.C. § 1331, this Court has subject-matter jurisdiction based on Plaintiffs' claims for violation of the federal Truth in Lending Act ("TILA"), 15 U.S.C. § 1601 *et seq.*

37.     This Court has further jurisdiction over Defendants because they either are foreign corporations authorized to conduct business in Florida, are doing business in Florida and have registered with the Florida Secretary of State, or do sufficient business in Florida, have sufficient minimum contacts with Florida, or otherwise intentionally avail themselves of the Florida consumer market through the promotion, marketing, sale, and service of mortgages or other lending services and insurance policies in Florida.  This purposeful availment renders the exercise of jurisdiction by this Court over Defendants and their affiliated or related entities permissible under traditional notions of fair play and substantial justice.

38.     In addition, this Court has subject-matter jurisdiction under CAFA because the amount in controversy exceeds $5 million and diversity exists between Plaintiffs and Defendants. 28 U.S.C. § 1332(d)(2).  Further, in determining whether the $5 million amount in controversy requirement of 28 U.S.C. § 1332(d)(2) is met, the claims of the putative class members are aggregated.  28 U.S.C. § 1332(d)(6).

39.     Venue is proper in this forum pursuant to 28 U.S.C. § 1391 because Defendants transact business and may be found in this District and a substantial portion of the practices complained of herein occurred in the Southern District of Florida.

40.     All conditions precedent to this action have occurred, been performed, or have been waived.

## FACTUAL ALLEGATIONS

41.     The standard form mortgage agreements for loans owned or serviced by Carrington, Fay, and RCS include a provision requiring the borrower to maintain hazard insurance coverage, flood insurance coverage if the property is located in a Special Flood Hazard Area as determined

10C5717

by the Federal Emergency Management Agency, and wind insurance on the property securing the

loan.  In the event that the insurance lapses, the standard form mortgage agreements permit the

servicer to obtain force-placed coverage to protect the lender's interest in the loan and to charge

the cost of the insurance to the borrower rather than declare the borrower in default.

42.     What is unknown to borrowers, and not disclosed in the standard form mortgage

agreements, is that Carrington, Fay, and RCS have exclusive arrangements with Southwest and

American Modern to manipulate the force-placed insurance market and artificially inflate the

charges to Plaintiffs and the Class members.  The charges are inflated to provide the servicers with

kickbacks disguised as "commissions," or "expense reimbursements," or to provide the servicers

with lucrative reinsurance arrangements that include unmerited charges, and to provide other

financial benefits in the form of below-cost mortgage servicing functions that are not attributable

to the cost of insuring the individual property.

### American Modern's Force-Placed Insurance Scheme

43.     American Modern and Southwest have exclusive arrangements with Carrington,

Fay, and RCS to monitor their mortgage portfolios, perform additional mortgage servicing

functions (obligations properly borne by the servicer), and provide force-placed insurance

coverage.  In addition to the subsidized mortgage services they receive from Southwest and

American Modern, as set forth in detail below, the servicers are "kicked back" a percentage of the

force-placed premium that they have paid to the insurers.

44.     The scheme works as follows:  Carrington, Fay, or RCS purchase a master

insurance policy from American Modern that covers the entire portfolio of mortgage loans.  In

exchange, American Modern is given the exclusive right to force insurance on property securing

a loan within the portfolio when the borrower's insurance lapses or the lender determines the

borrower's existing insurance is inadequate.

16

10C5717

45.    As further described above, Carrington, specifically, also sold its rights to commissions and other kickbacks during the entire Class Period to Southwest for a payment of the Carrington Kickback.

46.    American Modern and Southwest monitor the entire loan portfolio for lapses in borrowers' insurance coverage.  Once a lapse is identified, American Modern or Southwest sends a cycle of notices to the borrower in the servicer's name, stating that it will purchase insurance for the property, for which the borrowers will be financially responsible, and force-place it on the property.  In reality, however, the master policy is already in place and Carrington, Fay, or RCS do not purchase a new policy on the individual borrower's behalf, rather, a certificate of insurance from the master policy is automatically issued by American Modern or Southwest.  The notice further states that the insurance charges will be applied to the borrower's loan, plus interest.

47.    Southwest acts as an agent for both the servicers and American Modern in the procurement and placement of American Modern's force-placed insurance.  Southwest also helps Carrington, Fay, and RCS administer their force-placed program at below-cost.

48.    The letters or notices sent to borrowers are processed pursuant to an automated system used by American Modern and Southwest that generates and sends the letters at predetermined times.  The letters indicate an address for borrowers to submit proof of insurance or correspondence to Carrington, Fay, or RCS; however, the address is actually for an American Modern location because they, and Southwest, are performing these services for the servicers. Each borrower is subject to Defendants' automated system and receives materially the same letters described above.

49.    Once a certificate is issued pursuant to the pre-existing master policy, coverage is forced on the property and Carrington, Fay, or RCS charge the borrower an amount they attribute to the "cost" of the American Modern force-placed insurance, which is either deducted from the

borrower's mortgage escrow account or added to the balance of the borrower's loan.[11]   The borrower's escrow account is depleted irrespective of whether other escrow charges, such as property taxes, are also due and owing.

50.     No individualized underwriting ever takes place for the force-placed coverage. Insurance is automatically placed on the property and the inflated amounts, including the unlawful kickbacks, are charged to the borrower.

51.     To fund the force-placed insurance scheme, Carrington, Fay, or RCS pay American Modern for the certificate of insurance, which issues from the already-existing master policy.  The servicers' obligation to pay American Modern for the force-placed insurance arises from the agreements between them and American Modern, which govern the mortgage servicing functions that American Modern and Southwest perform as well as the procurement of the master policy, and are executed and already in place before the borrower's coverage lapses.

52.     Once coverage has issued and Carrington, Fay, or RCS have paid for the insurance, American Modern kicks back a set percentage of the premium to them, on some occasions through Southwest, as a "commission" or an "expense reimbursement."  The money paid back to the servicers is not given in exchange for any services provided by them; it is simply grease paid to keep the force-placed machine moving.  In an attempt to mask the kickbacks as legitimate, American Modern or Southwest may disclose in their form letters to the borrower that the servicer may earn "commissions" as a result of the forced placement of new coverage, or that they incurred "costs" as a result of the force-placement of insurance, or that a "fee" is due to an agency.

53.     The payment is not compensation for work performed; it is an effective rebate on the premium amount owed by the servicer, reducing the cost of coverage that Carrington, Fay, or

---

[11]  On some occasions, when a borrower does not have an escrow account, the lender creates an escrow account with a negative balance and charges the borrower to bring the balance to zero.

RCS pay to American Modern.  The "commissions" or "expense reimbursements" are not legitimate reimbursements for actual costs, nor are they payments that have been earned for any work done by the servicers or an affiliate related to the placement of the insurance; they are unlawful kickbacks for the exclusive arrangement to force-place insurance

54.     In reality, no work is ever done by the servicer or Southwest to procure insurance for that particular borrower because the coverage comes through the master policy already in place and the procedures are automated.  Carrington, Fay, and RCS do not seek out insurance policies on borrower's behalf and have no involvement in the placing of the insurance or the collection of the charges from the borrower.  As a result, the amount paid is not a true "commission," no income is "earned," and Carrington, Fay, and RCS do not incur any "costs" in relation to the force-placement of insurance for any particular borrower.

55.     The NYDFS 2013 Consent Order acknowledges that these "commissions" are unearned, noting, in relevant part:

> Commissions to Insurance Producers Affiliated with Mortgage Servicers
> In some cases, American Modern has paid commissions to insurance agencies and brokers that are affiliates of mortgage servicers. . . The evidence from the [NYDFS] Investigation indicates that affiliated agencies and brokers do little or no work for the commissions American Modern has paid to them[.] Commissions paid to affiliates are a form of reverse competition; when insurers compete for servicers' business by offering higher commissions to servicers' affiliates, there is no incentive to reduce force-place insurance premium rates. Commissions are paid to affiliates of servicers because they are a cost of staying in the market, not for any particular work the affiliates perform.

56.     Similarly, the NAIC has expressed concern with the "reverse competition" at play in the lender-placed insurance market whereby the insurers compete by offering mortgage lenders and servicers a share in the profits, rather than by offering lower prices.  On its website, the NAIC states:

> A key regulatory concern with the growing use of lender-placed insurance is "reverse competition," where the lender chooses the coverage provider and

19

amounts, yet the consumer is obliged to pay the cost of the coverage. Reverse competition is a market condition that tends to drive up prices to the consumers, as the lender is not motivated to select the lower price for coverage since the cost is born by the borrower. Normally competitive forces tend to drive down costs for consumers. However, in this case, the lender is motivated to select coverage from an insurer looking out for the lender's interest rather than the borrower.

*See* http://www.naic.org/cipr_topics/topic_lender_placed_insurance.htm.

57.     Carrington, Fay, and RCS also enter into exclusive agreements whereby American Modern and Southwest provide mortgage servicing functions on their entire loan portfolio at below cost. These functions, which include, but are not limited to activities such as "new loan boarding," "escrow administration," "customer service," and "loss draft services," are often not related to the provision of force-placed insurance and are performed at below cost as a way to keep the exclusive arrangement in place. Indeed, American Modern does not perform these services for a lender or servicer without also being the exclusive provider of force-placed insurance. Southwest does not perform these services for a lender or servicer without also being the exclusive vendor for the procurement of force-placed insurance.

58.     Upon information and belief, Southwest is able to perform many of the mortgage servicing functions at below-cost because of the funds it receives from American Modern from the force-placed insurance charges.

59.     The full cost of the servicing activities is added into the force-placed amounts which are then passed on to the borrower. American Modern and Southwest are able to provide mortgage servicing functions at below cost because of the enormous profits they make from the amounts charged for force-placed insurance. However, because insurance-lapsed mortgaged property generally comprises only 1-2% of the lenders' total mortgage portfolio, the borrowers, like Plaintiffs here, who are charged for the force-placed insurance unfairly bear the cost to service and monitor the entire loan portfolio. These charges, passed on to Plaintiffs and the proposed classes,

are not properly chargeable to the borrower because they are expenses associated with the servicing of all the loans and Carrington is already compensated for these activities by the owners of the loans (e.g. Fannie Mae).

60.     Thus, the small percentage of borrowers who are charged for force-placed insurance shoulder the costs of monitoring the servicer's entire loan portfolio, effectively resulting in a kickback.

61.     In addition, upon information and belief, American Modern enters into essentially riskless "captive reinsurance arrangements" with Carrington, Fay, and RCS, or its affiliates, to "reinsure" the property insurance force-placed on borrowers.   An *American Banker* article illustrated this reinsurance problem using JPMorgan Chase's program with Assurant, Inc. by way of example:

> JPMorgan and other mortgage servicers reinsure the property insurance they buy on behalf of mortgage borrowers who have stopped paying for their own coverage. In JPMorgan's case, 75% of the total force-placed premiums cycle back to the bank through a reinsurance affiliate. This has raised further questions about the force-placed market's arrangements.

Over the last five years, Chase has received $660 million in reinsurance payments and commissions on force-placed policies, according to New York's DFS[.]

> Of every hundred dollars in premiums that JPMorgan Chase borrowers pay to Assurant, the bank ends up keeping $58 in profit, DFS staff asserted. The agency suggested the bank's stake in force-placed insurance may encourage it to accept unjustifiably high prices by Assurant and to avoid filing claims on behalf of borrowers, since that would lower its reinsurer's returns.

> The DFS staff also questioned the lack of competition in the industry, noting that Assurant and QBE have undertaken acquisitions that give them long-term control of 90% of the market.   Further limiting competition are the companies' tendency to file identical rates in many states, Lawsky and his staff argue.

J. Horwitz, *Chase Reinsurance Deals Draw New York Regulator's Attacks*, AM. BANKER, May18,

2012, *available at* http://www.americanbanker.com/issues/177_97/chase-reinsurance-deals-regulator-attack-1049460-1.html.

62.     American Modern's reinsurance program is simply a way to funnel profits from the force-placed scheme, in the form of ceded premiums, to the servicers at borrowers' expense.  While reinsurance can, and often does, serve a legitimate purpose, here it does not.  Carrington, Fay, and RCS enter into reinsurance agreements with American Modern that provide that the insurer will return significant percentages of the premiums charged to borrowers by way of ceded reinsurance premiums to the servicer's affiliates – which in turn provide these premiums to Carrington, Fay, or RCS often in the form of "soft-dollar" or other credits.  The ceded premiums are nothing more than a kickback and a method for the mortgage servicers to profit from the forced placement of new coverage.  Indeed, while the servicers or their affiliates purportedly provided reinsurance, they did not assume any real risk.

63.     As detailed by the NYDFS Consent Order, American Modern merely copied their rate structure from another lender placed insurer company named American Bankers Insurance Company.  This is called a "me too" filing.  Although the filed rates assumed loss ratios of 55.9% (i.e. $.56 of every dollar in premiums would go to actual claims), in reality American Modern's loss ratios never came close to 55.9%.

64.     The amounts charged to borrowers are also inflated by the interest that accrues on the amounts owed for force-placed coverage.  When Defendants add the cost of the high-price force-placed insurance to a homeowner's mortgage balance, it thereby increases the interest paid over the life of the loan by the homeowner to the lender.

65.     The actions and practices described above are unconscionable and undertaken in bad faith with the sole objective to maximize Defendants' profits at the expense of Plaintiffs and the other Class members.  Borrowers who for whatever reason have stopped paying for insurance

10C5717

or are under-insured on mortgaged property, are charged amounts which reflect inflated and illegitimate noncompetitive amounts for force-placed insurance.  These charges are inflated to finance undisclosed kickbacks among Defendants or their affiliates (who, as described above, perform little, if any, work related to the forced placement of the individual policies), as well as the cost of captive reinsurance arrangements and the provision of below-cost mortgage servicing functions.

66.     Borrowers have no say in the selection of the force-placed insurance carrier or the terms of the force-placed insurance policies and have no ability to seek out and purchase their own force-placed insurance policy.  Force-placed policies are commercial insurance policies intended to be sold to lenders and servicers and their terms are determined by the lender/servicer, here, Carrington, Fay, or RCS, the agent Southwest, and the insurer, here, American Modern.  It is the mortgage servicer and not the borrower that is the Named Insured on the force-placed policies.

67.     Plaintiffs do not challenge the servicer's right to force place insurance in the first instance nor do they challenge the rates filed by American Modern.[12]  They challenge the discretion afforded mortgage lenders and servicers in purchasing force-placed insurance, as well as Defendants' manipulation of the force-placed insurance market whereby American Modern and Southwest provide kickbacks to the mortgage servicers to keep the exclusive arrangement in place.  These kickbacks provide an effective rebate on the purchase of the force-placed insurance that is not passed on to the borrower.  Servicers, like Carrington, Fay, and RCS are financially motivated

---

[12] American Modern may not have even charged Plaintiffs and the Class members the filed rates. It admits in the RSA, consistent with the finding of the FLOIR, that American Modern may have filed their rates with the various state insurance entities for approval, but in fact charged Carrington amounts which were different from those approved rates.  Carrington passed those charges onto the borrower.  American Modern also charged Carrington unfiled rates through their surplus lines insurer American Modern Surplus Lines Insurance Company which were then passed onto the Plaintiffs and the Class.

10C5717

to select the insurer, like American Modern, that offers it the best financial benefit in the terms of "commissions," "expense reimbursements," direct payments, discounted mortgage servicing, or debt forgiveness.

68.     This action is brought to put an end to Defendants' exclusive, collusive, and uncompetitive arrangements, and to recover for Plaintiffs the excess amounts charged to them beyond the true cost of insurance coverage.  Plaintiffs seek to recover the improper charges passed on to them and other Carrington borrowers nationwide through their claims for breach of contract, breach of the implied covenant of good faith and fair dealing, unjust enrichment, tortious interference with a contract or advantageous business relationship, and violations of FDUTPA, TILA, and RICO.

### Plaintiffs Strickland and Masters

69.     Plaintiffs Strickland and Masters took a mortgage loan from Premier Home Mortgage Services, Inc. in October 2007, secured by a mortgage on real property in Polk City, Florida.  In August 2014, the servicing rights to the mortgage were transferred to Carrington. Accordingly, at all times relevant to the allegations herein, the mortgage loan was owned and/or serviced by Carrington.

70.     Plaintiffs Strickland and Masters' mortgage provides as follows:

> 5. **Property Insurance**.  Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires.
>
> * * * *
>
> If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense.  Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect

24

10C5717

Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage that was previously in effect.  Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained.  Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument.  These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

*    *    *    *

9.  **Protection of Lender's Interest in the Property and Rights Under this Security Instrument.**  If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument . . . then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument[.]

*    *    *    *

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument.  These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

71.    In 2014, Plaintiffs Strickland and Masters' voluntary insurance lapsed.  Pursuant to the automated procedures in place and purporting to come from Carrington, on August 9, 2014, Defendants sent a letter informing Plaintiffs Strickland and Masters that Carrington "plan[ed]" to buy insurance for [their] property."   The letter stated the effective date of the policy would be August 1, 2014.

72.    Accompanying the letter were additional pages entitled "Important Homeowners Insurance Information."   The additional page stated that "[t]he cost of insurance coverage we obtain may be significantly higher than the cost of insurance you could obtain on your own.  This is because the insurance we obtain is issued automatically without evaluating the risk of insuring your property."

73.    On September 10, 2014, the automated procedures led to a second letter that was sent to Plaintiffs Strickland and Masters.  This second letter stated that "[t]he insurance we buy:

25

will cost an estimated $1,378.44 annually…." A similar "Important Homeowners Insurance Information" was attached.

74.      On September 28, 2014, pursuant to the automated procedures in place and purporting to come from Carrington, Defendants sent a letter informing Plaintiffs Strickland and Masters that Carrington purchased lender placed hazard coverage on their property "at [their] sole expense." The letter stated that Carrington had purchased $122,000 in hazard coverage with an annual hazard premium of $1,378.44. The letter stated that insurance "[c]osts $1,378.44 annually…." The letter also stated that Carrington "added the cost [of the insurance] to your mortgage loan account."

75.      Accompanying the third letter was another "Important Homeowners Insurance Information" sheet and a document entitled Evidence of Insurance. The Evidence of Insurance lists Southwest as the Agency, and American Western as the insurance company. Although Southwest is listed as the procuring agency, the reality is this document was a certificate of insurance issued by American Modern from the master policy already in place.

76.      The letters, additional pages, and Evidence of Insurance listed above do not disclose any aspect of the secret and illegal compensation arrangement entered into by American Modern, Southwest, and Carrington, or inform the Plaintiffs that they would be charged illegitimate amounts beyond Carrington's cost of coverage.

77.      On December 31, 2014, Plaintiffs Strickland and Masters purchased voluntary insurance for their home with an annual premium of $1,271.00. This premium included insurance with significantly more coverage, including but not limited to, personal property, medical, and personal liability protections. On January 8, 2015, the Defendants sent a letter to Plaintiffs Strickland and Masters which provided notice that the lender placed insurance had been cancelled, effective December 31, 2014. The letter stated that "[a] premium of $570.66 was charged to your

account for the time the policy was in force."

78.     Defendants' communications to Plaintiffs Strickland and Masters were false and misleading.  Defendants represented in their letters that they were charging them the amounts paid for the "cost" of the insurance.  However, the charges imposed on Plaintiffs Strickland and Masters did not reflect Carrington's true cost of coverage because Carrington was receiving an effective rebate on the force-placed insurance through the kickback scheme described above.  Carrington, therefore, paid less for coverage than it represented to and charged Plaintiffs Strickland and Masters and the Class members.

79.     Defendants' communications to Plaintiffs Strickland and Masters were also misleading in that they represented that Carrington "purchased" the individual insurance for their property through an agency, when an exclusive arrangement and master policy was already in place with American Modern, and neither Carrington nor any agency would, in fact, perform any additional work to procure coverage for the Plaintiffs Strickland and Masters' property.

80.     It was never disclosed to Plaintiffs Strickland and Masters or the putative Class members that because of Defendants' kickback scheme, Carrington would be receiving a rebate and effectively be paying less for the force-placed insurance coverage than it would charge Plaintiffs Strickland and Masters and the putative class.  Nor was it disclosed to Plaintiffs Strickland and Masters or the Class members that the amounts charged to them covered other illegitimate kickbacks and below cost mortgage servicing functions not properly charged to them.

81.     Plaintiffs Strickland and Masters paid and/or still owes the charges for the force-placed insurance.

82.     There were no material differences between Defendants' actions and practices directed to Plaintiffs Strickland and Masters and their actions and practices directed to the Class.

10C5717

**Plaintiffs John and Jacqueline Sekula**

83.     The Sekula Plaintiffs took a mortgage loan from CountryWide Home Loans in September 2006 secured by a mortgage on real property in Sanford, Florida.  As of at least December 2013, the mortgage loan was being serviced by RCS.

84.     The Sekula Plaintiffs' mortgage provides as follows:

> 5.  **Property Insurance**.  Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires.
>
> * * * *
>
> If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense.  Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage that was previously in effect.  Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained.  Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument.  These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.
>
> * * * *
>
> 9.  **Protection of Lender's Interest in the Property and Rights Under this Security Instrument.**  If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument . . . then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument[.]
>
> * * * *
>
> Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument.  These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

85.     For the year February 26, 2014 to February 26, 2015, RCS force-placed insurance

28

on the Sekulas' property with dwelling coverage limits of $485,900 through a policy issued by American Western Home Insurance Company. The annual premium for the insurance in the amount of $10,544 was charged to the Sekulas' escrow account. The dwelling coverage greatly exceeded the replacement value of the Sekula's home, which was valued at that time at less than $300,000.

86.     The Sekula Plaintiffs, on their own, in late 2014 procured appropriate and proper hazard insurance for the property with appropriate dwelling replacement value coverage limits, but the annual premium for that privately-placed insurance policy was $785.

87.     The Sekula Plaintiffs received materially similar letters regarding the force-placement of insurance as the other Plaintiffs only their letters purported to come from RCS but were actually sent by American Western pursuant to the automated procedures in place.

88.     It was never disclosed to the Sekula Plaintiffs or the putative Class members that because of Defendants' kickback scheme, RCS would effectively be paying less for the force-placed insurance coverage than it would charge Mr. and Mrs. Sekula and the putative class.  Nor was it disclosed to the Sekulas or the Class members that the amounts charged to them covered other illegitimate kickbacks and below cost mortgage servicing functions not properly charged to them.

89.     The Sekula Plaintiffs paid and/or still owe the charges for the force-placed insurance.

90.     There were no material differences between Defendants' actions and practices directed to the Sekula Plaintiffs and their actions and practices directed to the Class.

**Plaintiff Latasha Jackson**

91.     Plaintiff Latasha Jackson took a mortgage loan from Wachovia Mortgage Corporation on April 11, 2007, secured by a mortgage on real property at 4309 Old Mobile Hwy,

Pascagoula, Mississippi 39581.  At all times relevant to the allegations herein, Ms. Jackson's

mortgage loan was owned and/or serviced by Fay.

92.    Ms. Jackson's mortgage provides as follows:

5.  Property Insurance.  Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance.  This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires.

*  *  *  *

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense.  Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage that was previously in effect.  Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained.  Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument.   These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

*  *  *  *

9.   Protection of Lender's Interest in the Property and Rights Under this Security Instrument.  If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument . . .  then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument[.]

*  *  *  *

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument.  These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment

93.    Pursuant to the automated procedures in place and purporting to come from Fay,

on August 7, 2015, Defendants sent a letter informing Plaintiff Jackson that Fay purchased lender

placed hazard coverage on her property.  The letter stated that Fay had purchased $73,504 in hazard

10C5717

coverage with an annual hazard premium of $795.24. The letter stated that insurance "[c]osts $795.24 annually…." The letter also stated that Plaintiff Jackson would be required to reimburse Fay for the premium associated with the coverage.

94.     On March 30, 2016, Ms. Jackson was sent a letter purporting to come from Fay Servicing and informing her that the American Modern force-placed policy was canceled as of September 1, 2015 and that a refund of $183.85 would be credited to her loan.

95.     Southwest is listed as the procuring agency in the Evidence of Insurance sent with the letter.

96.     Accompanying the letter was an additional page entitled "Frequently Asked Questions about Property Insurance." The letter and additional page did not disclose any aspect of the secret and illegal compensation arrangement entered into by American Modern, Southwest, and Fay, or inform Ms. Jackson that she would be charged illegitimate amounts beyond Fay's cost of coverage.

97.     Upon information and belief, the Defendants sent similar letters to Plaintiff Jackson relating to cost of the placement of this insurance which was paid by Fay and required to be reimbursed by Plaintiff Jackson.

98.     Defendants' communications to Ms. Jackson were false and misleading. Defendants represented in their letters to Ms. Jackson that they were charging her the amounts paid for the cost of the insurance. However, the charges imposed on Ms. Jackson did not reflect Fay's true cost of coverage because Fay was receiving an effective rebate on the force-placed insurance through the kickback scheme described above. Fay had, as such, paid less for coverage than it represented to and charged Ms. Jackson and the Class members.

99.     Defendants' communications to Ms. Jackson were also misleading in that they represented that Fay "purchased" the individual insurance for the Jackson property through an

agency, when an exclusive arrangement and master policy was already in place with American Modern, and neither Fay nor any agency would, in fact, perform any additional work to procure coverage for Ms. Jackson's property.

100.   It was never disclosed to Ms. Jackson or the putative Class members that because of Defendants' kickback scheme, Fay would effectively be paying less for the force-placed insurance coverage than it would charge Ms. Jackson and the putative class.  Nor was it disclosed to Ms. Jackson or the Class members that the amounts charged to them covered other illegitimate kickbacks and below cost mortgage servicing functions not properly charged to them.

101.   Ms. Jackson paid and/or still owes the charges for the force-placed insurance.

102.   There were no material differences between Defendants' actions and practices directed to Ms. Jackson and their actions and practices directed to the Class.

## CLASS ALLEGATIONS

### A.  Class Definition

103.   Plaintiffs bring this action against Defendants pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and all other persons similarly situated.  Plaintiffs seek to represent the following three classes:

### (1) Nationwide classes:

All borrowers who, within the applicable statutes of limitation, were charged for a force-placed hazard insurance policy through Carrington or its affiliates, entities, or subsidiaries.  Excluded from this class are Defendants, their affiliates, subsidiaries, agents, board members, directors, officers, and/or employees.

All borrowers who, within the applicable statutes of limitation, were charged for a force-placed hazard insurance policy through Fay or its affiliates, entities, or subsidiaries.  Excluded from this class are Defendants, their affiliates, subsidiaries, agents, board members, directors, officers, and/or employees.

32

> **(2) Florida Subclass with Plaintiffs Strickland and Masters as the Class Representatives:**
>
> All Florida borrowers who, within the applicable statutes of limitation, were charged for a force-placed hazard insurance policy through Carrington or its affiliates, entities, or subsidiaries. Excluded from this class are Defendants, their affiliates, subsidiaries, agents, board members, directors, officers, and/or employees.
>
> **(3) Mississippi Subclass with Plaintiff Jackson as the Class Representative:**
>
> All Mississippi borrowers who, within the applicable statutes of limitation, were charged for a force-placed hazard insurance policy through Fay or its affiliates, entities, or subsidiaries. Excluded from this class are Defendants, their affiliates, subsidiaries, agents, board members, directors, officers, and/or employees.
>
> **(4) Nationwide Class against American Modern for RCS borrowers with the Sekula Plaintiffs as the Class Representatives:**
>
> All borrowers who, within the applicable statutes of limitation, were charged for a force-placed hazard insurance policy through RCS or its affiliates, entities, or subsidiaries. Excluded from this class are Defendants, their affiliates, subsidiaries, agents, board members, directors, officers, and/or employees.

104.    Plaintiffs reserve the right to modify or amend the definition of the proposed Classes before the Court determines whether certification is appropriate.

105.    Defendants subjected Plaintiffs and the respective Class members to the same unfair, unlawful, and deceptive practices and harmed them in the same manner.

**B. Numerosity**

106.    The proposed classes are so numerous that joinder of all members would be impracticable. Defendants sell and service hundreds of thousands of mortgage loans and insurance policies in the States of Florida, Mississippi, and nationwide. The individual Class members are ascertainable, as the names and addresses of all Class members can be identified in the business

33

10C5717

records maintained by Defendants.   The precise number of Class members number at least in the thousands and can only be obtained through discovery, but the numbers are clearly more than can be consolidated in one complaint such that it would be impractical for each member to bring suit individually.  Plaintiffs do not anticipate any difficulties in the management of the action as a class action.

### C. **Commonality**

107.   There are questions of law and fact that are common to Plaintiffs' and Class members' claims.  These common questions predominate over any questions that go particularly to any individual member of the Classes.  Among such common questions of law and fact are the following:

> a.   Whether Carrington, Fay, and RCS breached their mortgage contracts with Plaintiffs and the Class by selecting American Modern in order to receive illegal kickbacks (in the form of unwarranted commissions, expense reimbursements, below-cost mortgage servicing, or reinsurance payments) and by charging the higher cost to Plaintiffs and the Class members;

> b.   Whether Carrington, Fay, and RCS breached the implied covenant of good faith and fair dealing by entering into exclusive arrangements with selected insurers and/or their affiliates, which resulted in costs beyond that of coverage being charged to Plaintiffs and the Class members;

> c.   Whether Defendants manipulated the force-placed insurance procurement process in order to maximize their profits to the detriment of Plaintiffs and the Class members;

> d.   Whether Carrington, Fay, or RCS performed any work or services in exchange for the "commissions" or other forms of kickbacks it collected;

> e.   Whether Carrington, Fay, or RCS incurred any expenses in the placement of force-placed insurance on Plaintiffs' or the Class members' properties;

> f.   Whether American Modern and Southwest intentionally and unjustifiably interfered with Plaintiffs' and the Classes' rights under the mortgage contracts by inducing Carrington, Fay, or RCS to charge more for force-placed insurance coverage to Plaintiffs and the Classes than they effectively paid because of the kickbacks and other financial windfalls, including steeply discounted

34

administrative services they received;

g.   Whether there was actually a transfer of risk under Defendants' purported reinsurance arrangement;

h.   Whether Carrington and Fay have been unjustly enriched at the expense of Plaintiffs and the Class; and

i.   Whether Plaintiffs and the Class members are entitled to damages and/or injunctive relief as a result of Defendants' conduct.

**D.  Typicality**

108.   Plaintiffs are members of the Classes they seek to represent.  Plaintiffs' claims are typical of the respective classes' claims because of the similarity, uniformity, and common purpose of Defendants' unlawful conduct.   Each Class member has sustained, and will continue to sustain, damages in the same manner as Plaintiffs as a result of Defendants' wrongful conduct.

**E.  Adequacy of Representation**

109.   Plaintiffs are adequate representatives of the Classes they seek to represent and will fairly and adequately protect the interests of the Classes.  Plaintiffs are committed to the vigorous prosecution of this action and have retained competent counsel, experienced in litigation of this nature, to represent them.  There is no hostility between Plaintiffs and the unnamed Class members. Plaintiffs anticipate no difficulty in the management of this litigation as a Class action.

110.   To prosecute this case, Plaintiffs have chosen the undersigned law firms, which are very experienced in class action litigation and have the financial and legal resources to meet the substantial costs and legal issues associated with this type of litigation.

**F.  Requirements of Fed. R. Civ. P. 23(b)(3)**

111.   The questions of law or fact common to Plaintiffs' and each Class member's claims predominate over any questions of law or fact affecting only individual members of the class.   All claims by Plaintiffs and the unnamed Class members are based on the force-placed insurance

10C5717

policies that Defendants unlawfully implemented and their deceptive and egregious actions involved in implementing the force-placed policy.

112.    Common issues predominate when, as here, liability can be determined on a class-wide basis, even when there will be some individualized damages determinations.

113.    As a result, when determining whether common questions predominate, courts focus on the liability issue, and if the liability issue is common to the class as is the case at bar, common questions will be held to predominate over individual questions.

**G.  Superiority**

114.    A class action is superior to individual actions in part because of the non-exhaustive factors listed below:

> (a) Joinder of all Class members would create extreme hardship and inconvenience for the affected customers as they reside all across the state;
>
> (b) Individual claims by Class members are impractical because the costs to pursue individual claims exceed the value of what any one Class member has at stake.   As a result, individual Class members have no interest in prosecuting and controlling separate actions;
>
> (c) There are no known individual Class members who are interested in individually controlling the prosecution of separate actions;
>
> (d) The interests of justice will be well served by resolving the common disputes of potential Class members in one forum;
>
> (e) Individual suits would not be cost effective or economically maintainable as individual actions; and
>
> (f) The action is manageable as a class action.

**H.  Requirements of Fed. R. Civ. P. 23(b)(1) & (2)**

115.    Prosecuting separate actions by or against individual Class members would create a risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for the party opposing the Class.

116.    Defendants have acted or failed to act in a manner generally applicable to the

10C5717

Classes, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Classes as a whole.

## COUNT I

**BREACH OF CONTRACT**
**(Plaintiffs Strickland and Masters against Carrington on behalf of the Nationwide Carrington Class and the Florida Subclass. Plaintiff Jackson against Fay on behalf of the nationwide Fay Class and the Mississippi Subclass)**

117.    Plaintiffs re-allege and incorporate paragraphs 1-116 above as if fully set forth herein and further alleges as follows.

118.    Plaintiffs and all similarly situated Class members have mortgages that were owned and/or serviced by Carrington or Fay.

119.    Plaintiffs' and these Class members' mortgages are written on uniform mortgage forms and contain substantially similar provisions regarding force-placed insurance requirements and its placement by Carrington and Fay.  The force-placed provisions from Plaintiffs' mortgages are set forth above.

120.    Paragraph 5 of Plaintiffs' mortgages require that they maintain insurance on their properties and provide that if they should fail to do so, the lender or servicer might obtain insurance coverage to protect its interest in the property, "force place" the coverage, and charge the borrower the "cost of the insurance coverage."  Paragraph 9 of Plaintiffs' mortgages further provide that the lender may do and pay for whatever is reasonable or appropriate to protect its interest in the property and rights under the mortgage agreement, including protecting and/or assessing the value of the property and securing and/or repairing the property.

121.    Under these paragraphs of Plaintiffs' mortgage contracts, Carrington and Fay assumed by assignment or otherwise all obligations and liabilities relating to force-placed insurance.  Carrington and Fay charge borrowers amounts for force-placed insurance that are more

37

10C5717

than the actual amount they pay for the coverage because the charges include unearned "commissions," "expense reimbursements," and other kickbacks, as well as subsidies for below-cost mortgage servicing functions that have little or nothing to do with the placement of force-placed insurance. These costs are not costs of coverage, and are not applied to protecting Carrington's or Fay's rights or risk in the collateral for borrowers' mortgage loans. They are simply bribes to keep Defendants' exclusive relationship in place.

122.    Through the kickbacks they receive, Carrington and Fay pay less for force-placed coverage than they charge to Plaintiffs and other Class members.

123.    Carrington and Fay breached the mortgage agreements by, among other things, charging Plaintiffs and absent class members the amounts beyond the actual cost of coverage and more than what was reasonable or appropriate to protect its interest in the property.

124.    Plaintiffs and the Class members have suffered damages as a result of Carrington's and Fay's breach of contract.

**WHEREFORE**, Plaintiffs, on behalf of themselves and all similarly situated Class members, seek compensatory damages resulting from Carrington's and Fay's breaches of contract, as well as injunctive relief preventing them from further violating the terms of the mortgages. Plaintiffs further seek all relief deemed appropriate by this Court, including attorneys' fees and costs.

## COUNT II

### BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING
**(Plaintiffs Strickland and Masters against Carrington on behalf of the Nationwide Carrington Class and the Florida Subclass. Plaintiff Jackson against Fay on behalf of the Nationwide Fay Class and the Mississippi Subclass.)**

125.    Plaintiffs re-allege and incorporate paragraphs 1-116 and 117-124 above as if fully set forth herein and further allege as follows.

38

10C5717

126.     A covenant of good faith and fair dealing is implied in every contract and imposes upon each party a duty of good faith and fair dealing in its performance.  Common law calls for substantial compliance with the spirit, not just the letter, of a contract in its performance.

127.     Where an agreement affords one party the power to make a discretionary decision without defined standards, the duty to act in good faith limits that party's ability to act capriciously to contravene the reasonable contractual expectations of the other party.

128.     Plaintiffs' and the Class members' mortgage contracts allow Carrington and Fay to force-place insurance coverage on borrowers in the event of a lapse in coverage, but do not define standards for selecting an insurer or procuring an insurance policy.

129.     Carrington and Fay were afforded substantial discretion in force-placing insurance coverage.  They were permitted to unilaterally choose the company from which it purchased force-placed insurance and negotiate the price of the coverage it procured without restriction.  Carrington and Fay had an obligation to exercise their discretion in good faith, and not capriciously or in bad faith.

130.     The purpose of the mortgage clause allowing a lender, like Carrington and Fay, to force place insurance is to protect the lender's interest in the property that is collateral for the mortgage loan.  Carrington and Fay breached the implied covenant of good faith and fair dealing by making additional profits at Plaintiffs' expense by force-placing insurance on the property and receiving kickbacks on that insurance that bore no relation to protecting its interest in the property.

131.     Carrington and Fay further breached the implied covenant of good faith and fair dealing by, among other things:

(a)     Manipulating the force-placed insurance market by selecting insurers (here, American Modern and its affiliates) that will participate in a scheme to include kickbacks to Carrington and Fay not necessary to cover their risk;

39

(b)   Exercising their discretion to choose an insurance policy in bad faith and in contravention of the parties' reasonable expectations, by purposefully selecting force-placed insurers that participate in a scheme to maximize their own profits;

(c)   Assessing unnecessary charges against Plaintiffs and the Classes which Carrington and Fay attribute to the cost of the insurance coverage;

(d)   Receiving an effective rebate on the force-placed insurance through the kickback scheme but not passing on that rebate to the borrower, thereby creating the incentive to seek the highest-priced premiums possible;

(e)   Charging Plaintiffs and the Classes for "commissions" or expense reimbursements when the insurance is prearranged and no commission is earned or due and no expenses are incurred in placing the certificate of insurance;

(f)   Charging Plaintiffs and the Classes the cost of having Southwest perform their obligation of servicing its entire mortgage portfolio, which is not properly chargeable to Plaintiffs or the Classes;

(g)   Force-placing insurance coverage that is duplicative of existing coverage, or in excess of what is required by borrowers' mortgage agreements;

(h)   Seeking out an force-placed insurance insurer, here American Modern, that will provide them the best deal in terms of below-cost mortgage servicing functions with the knowledge that these functions will be subsidized by the amounts paid for force-placed insurance;

(i)  Force-placing insurance coverage in excess of that required to cover the lender's interest in the property; and

(j)   Charging Plaintiffs and the Classes amounts beyond the cost of coverage for the force-placed insurance due to the captive reinsurance arrangement.

132.   As a direct, proximate, and legal result of the aforementioned breaches of the covenant of good faith and fair dealing, Plaintiffs and the Class members have suffered damages.

**WHEREFORE**, Plaintiffs, on behalf of themselves and all similarly situated Class members, seek a judicial declaration that Carrington's and Fay's conduct described above and the amounts charged to borrowers are in contravention of its duties of good faith and fair dealing. Plaintiffs also seek compensatory damages resulting from Carrington's and Fay's breaches of their

10C5717

duties.  Plaintiffs further seek all relief deemed appropriate by this Court, including attorneys' fees and costs.

## COUNT III

### VIOLATION OF FDUTPA
### (against Carrington on behalf of Plaintiffs Strickland and Masters and the Florida Subclass)

133.    Plaintiffs incorporate paragraphs 1-116 herein as if fully set forth in Count III.

134.    FDUTPA, section 501.201, *et seq*., Florida Statutes, prohibits "unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce."  § 501.204, Fla. Stat.

135.    Plaintiffs and the Florida Subclass are "consumers" as that term is defined in section 501.203(7), Florida Statutes.

136.    Carrington has engaged in, and continues to engage in, unconscionable acts or practices and has engaged in unfair or deceptive acts in the conduct of its trade and/or commerce in the State of Florida.

137.    The policies, acts, and practices alleged herein were intended to result and did result in the payment of inflated premiums for force-placed insurance by the above-named Plaintiffs and the Florida Subclass, which in turn were intended to generate unlawful or unfair compensation for Carrington.

138.    Specifically, Carrington had an exclusive relationship with its vendor and preferred insurance carrier, whereby it would pay exorbitant premiums for force-placed insurance policies, charge that amount to Plaintiffs and the Florida Subclass, and then receive compensation through kickbacks based on a percentage of the insurance policy's premium as well as kickbacks in various other forms including, the SWBC Kickback, subsidized costs, direct payments, "expense

41

reimbursements," and debt forgiveness.  This effectively resulted in Carrington paying less for coverage than the amount it charged to Plaintiffs and the class.

139.    Carrington's conduct of charging borrowers inflated amounts for their force-placed insurance to Plaintiffs and members of the Florida Subclass violates FDUTPA and was conceived, devised, planned, implemented, approved, and executed within the State of Florida, which has an interest in prohibiting violations of FDUTPA.

140.    Carrington is not a bank or savings and loan association regulated by the Florida Office of Financial Regulation of the Financial Services Commission.  Further, Carrington is not a bank or savings and loan association regulated by federal agencies.

141.    Plaintiffs and the Florida Subclass have sustained damages as a direct and proximate result of Carrington's unfair and unconscionable practices.  Section 501.211(2), Florida Statutes, provides Plaintiffs and the Florida Subclass a private right of action against this Defendant and entitles them to recover their actual damages, plus attorneys' fees and costs.

142.    Plaintiffs and the Florida Subclass have suffered and will continue to suffer irreparable harm if these Defendants continue to engage in such deceptive, unfair, and unreasonable practices.

**WHEREFORE,** Plaintiffs, on behalf of themselves and the Florida Subclass, demand judgment against the Carrington for damages, pre- and post-judgment interest, attorneys' fees, injunctive and declaratory relief, costs incurred in bringing this action, and any other relief as this Court deems just and proper.

10C5717

## COUNT IV

**TORTIOUS INTERFERENCE WITH A BUSINESS RELATIONSHIP**
**(The Sekula Plaintiffs and Plaintiffs Strickland, Masters, and Jackson against American Modern and Plaintiffs Strickland, Masters, and Jackson against Southwest on behalf of the Nationwide Classes and Florida, and Mississippi Subclasses)**

143.    Plaintiffs re-allege and incorporate paragraphs 1-116 above as if fully set forth herein and further allege as follows.

144.    Plaintiffs and the Class members have advantageous business and contractual relationships with their mortgage lender or servicer pursuant to the mortgage contracts.  Plaintiffs and the Class members have legal rights under these mortgage contracts.  For example, Plaintiffs and the Class members have a right not to be charged exorbitant amounts attributed to force-placed insurance in bad faith.

145.    American Modern and Southwest had knowledge of the mortgage contracts and the advantageous business and contractual relationships between Plaintiffs and the Classes and Carrington, Fay, and RCS.  American Modern and Southwest were not parties to the mortgage contracts, nor were they third-party beneficiaries of the mortgage contracts.  Further, American Modern and Southwest did not have any beneficial or economic interest in the mortgage contracts.

146.    American Modern and Southwest intentionally and unjustifiably interfered with Plaintiffs' and the Classes' rights under the mortgage contracts, as described above, by, *inter alia*, entering into an exclusive relationship with Carrington, Fay, and RCS and their affiliates, whereby Southwest provided Carrington with the Carrington Kickback and below-cost mortgage servicing functions (also provided to Fay) and American Modern provided kickbacks to Carrington, Fay, and RCS in the form of "commissions" or "expense reimbursements," or ceded reinsurance premiums, among other things, which are purposefully and knowingly charged to Plaintiffs and the Class members in exchange for the exclusive right to be the force-place insurance provider.

43

147.    As a result of American Modern's and Southwest's interference with the Plaintiffs' mortgage agreements, Defendants Carrington and Fay breached the express and implied terms of their mortgage contracts with Plaintiffs and members of the Classes, by using funds that were designated to pay insurance, taxes, and other items, in order to pay non-designated costs of Defendants, including kickbacks, reinsurance premiums, and subsidized mortgage servicing functions (i.e. new loan boarding, loss drafts) that have no relation to the placement of force-placed insurance. RCS similarly breached its contracts with the Sekula Plaintiffs.

148.    Plaintiffs and the Classes have been damaged as a result of American Modern's and Southwest's interference with their mortgage contracts by being charged bad faith, exorbitant, and illegal charges in connection with the force-placed insurance in contravention of their rights under the mortgages.

**WHEREFORE**, Plaintiffs, on behalf of themselves and all Class members similarly situated, seek a judgment in their favor against American Modern and Southwest for the actual damages suffered by them as a result of their tortious interference.  Plaintiffs also seek all costs of litigating this action, including attorneys' fees.

## COUNT V

### UNJUST ENRICHMENT
### (Plaintiffs Strickland and Masters against Carrington on behalf of the Carrington Nationwide Class and the Florida Subclass. Plaintiff Jackson against Fay on behalf of the Nationwide Fay Class and the Mississippi Subclass)[13]

149.    Plaintiffs re-allege and incorporate paragraphs 1-116 above as if fully set forth herein and further allege as follows.

150.    Carrington and Fay receive a rebate on the cost of the force-placed insurance

---

[13]    Plaintiffs pleads their unjust enrichment claim against Carrington and Fay in the alternative to their contractual claims against them.

10C5717

coverage but do not pass that rebate on to its borrowers.  The rebates are provided to Carrington in the form of the Carrington Kickback, and to Fay and Carrington in the form of other unwarranted kickbacks, including "expense reimbursements" or "commissions," captive reinsurance arrangements, and subsidized loan servicing costs.  These benefits to Carrington and Fay are paid through the amounts charged to Plaintiffs and the Class members for force-placed insurance.

151.    Carrington and Fay entered into an agreement whereby the insurance vendors – here, American Modern and Southwest – would provide below cost mortgage servicing activities and cover Carrington's and Fay's entire portfolio of loans with a master policy and issue certificates of insurance when a borrower's voluntary policy lapsed.  Carrington and Fay would then charge Plaintiffs and the Class amounts for the force-placed insurance that had been artificially inflated to include the kickbacks described above and then retain the amounts of those kickbacks for itself.  The force-placed policies imposed on borrowers therefore cost less than what Carrington and Fay had actually paid for them.

152.    American Modern and Southwest paid and collected significant monies in kickbacks, commissions, reimbursements, and reinsurance tied directly to the cost of the force-placed insurance premium (as a percentage).  Commissions or kickbacks were paid directly to Carrington and Fay or their affiliates in order to be able to exclusively provide force-placed insurance policies.  American Modern, its affiliates, and Southwest were mere conduits for the delivery of the kickbacks and improper rebates to Carrington or Fay.

153.    These payments directly benefitted Carrington and Fay and/or their affiliates and were taken to the detriment of the borrower.  The kickbacks (in the form of expense reimbursements, commissions, or reinsurance arrangements, as well as subsidized mortgage servicing functions) were subsumed into the charges to borrowers for the force-placed insurance and ultimately paid by them.  Therefore, Carrington and Fay had the incentive to seek out

45

unreasonably inflated prices for the force-placed insurance and charge the inflated amounts to borrowers.

154.    Further, Carrington and Fay was unjustly enriched through financial benefits in the form of increased interest income when the amounts for the force-placed insurance policies were added to the Class members' mortgage loans.

155.    As a result, Plaintiffs and the Class members have conferred a benefit on Carrington and Fay.

156.    Carrington and Fay had knowledge of this benefit and voluntarily accepted and retained the benefit conferred on them.

157.    Carrington and Fay will be unjustly enriched if they are allowed to retain the aforementioned benefits, and each Class member is entitled to recover the amount by which Carrington and Fay were unjustly enriched at his or her expense.

158.    Had Plaintiffs known the true facts behind Defendants' force-placed insurance scheme, that the charges from Carrington and Fay to them included the kickbacks described above, and that Carrington and Fay were receiving an effective rebate on the charges but not passing on that rebate to them, they would have expected remuneration from Carrington and Fay.

**WHEREFORE**, Plaintiffs, on behalf of themselves and all similarly situated Class members, demand an award against Carrington and Fay in the amounts by which they have been unjustly enriched at Plaintiffs' and the Class Members' expense, and such other relief as this Court deems just and proper.

10C5717

## COUNT VI

## UNJUST ENRICHMENT

### (Plaintiffs John and Jacqueline Sekula, Strickland, Masters and Jackson against American Modern on behalf of the Carrington, Fay, and RCS Nationwide Classes)

159.    Plaintiffs re-allege and incorporate paragraphs 1-116 above as if fully set forth herein and further allege as follows.

160.    Plaintiffs and the Class directly conferred benefits on American Modern. Specifically, American Modern received benefits in the form of funds for force-placed insurance policies from Plaintiffs and the Class members.

161.    American Modern received below-cost payments from Carrington, Fay, and RCS for providing mortgage-servicing functions (that often had nothing to do with the placement of the force-placed insurance), but included the entire cost of those functions in the amounts charged for force-placed insurance ultimately passed on to Plaintiffs and the Class members.  American Modern knew that the amounts for the force-placed insurance would be ultimately charged to the borrower and passed through to them, but did not reduce the charges by the amounts paid to them from Carrington, Fay, and RCS for the tracking services.

162.    On information and belief, American Modern deducted the excess force-placed insurance charges directly from borrowers' escrow accounts.  In the alternative, Carrington, Fay, and RCS in contract with American Modern, were mere conduits for the delivery of insurance charges to American Modern.

163.    As a result, Plaintiffs and the Class have conferred a direct benefit on American Modern.

164.    Plaintiffs and the Class expected remuneration or would have expected remuneration had they known the true facts surrounding American Modern's conduct.  For

47

example, had Plaintiffs and the Class known that the amounts charged them for insurance also included the costs of the kickbacks and other improper charges, they would have protested or paid less.

165.    American Modern had knowledge of this benefit and voluntarily accepted and retained the benefit conferred on it.

166.    American Modern will be unjustly enriched if it is allowed to retain the aforementioned benefits, and each Class member is entitled to recover the amount by which American Modern was unjustly enriched at his or her expense.

167.    WHEREFORE, Plaintiffs, on behalf of themselves and all similarly situated Class members, demands an award against American Modern in the amounts by which American Modern has been unjustly enriched at Plaintiffs' and the Class members' expense, and such other relief as this Court deems just and proper.

## COUNT VII

### VIOLATIONS OF THE TRUTH IN LENDING ACT, 15 U.S.C. § 1601, et seq.
**(Plaintiffs Strickland and Masters against Carrington on behalf of the Nationwide class.**
**Plaintiff Jackson against Fay on behalf of the Nationwide Fay class.)**

168.    Plaintiffs re-allege and incorporate paragraphs 1-116 above as if fully set forth herein and further allege as follows.

169.    Plaintiffs' and the Class Members' mortgages were consumer credit plans secured by their principal dwellings, and were subject to the disclosure requirements of the Truth in Lending Act ("TILA"), 15 U.S.C.§ 1601, *et seq.*, and all related regulations, commentary, and interpretive guidance promulgated by the Federal Reserve Board.

170.    Carrington and Fay are "creditors" as defined by TILA because they owned Plaintiffs' mortgages and changed the terms of the mortgage so as to create a new mortgage

10C5717

obligation, of which Carrington and Fay were the creditors.

171.    Pursuant to TILA, Carrington and Fay were required to accurately and fully disclose the terms of the legal obligations between the parties. *See* 12 C.F.R. § 226.17(c).

172.    Carrington and Fay violated TILA, specifically 12 C.F.R. § 226.17(c), when they: (i) added force-placed insurance charges to Plaintiffs' mortgage obligations and failed to provide new disclosures; and (ii) failed at all times to disclose the amount and nature of the kickback, reinsurance, discount loan monitoring, and/or other profiteering involving Carrington and Fay and/or their affiliates as a result of the purchase of force-placed insurance.

173.    When Carrington and Fay changed the terms of Plaintiffs' mortgage to allow previously unauthorized kickbacks and insurance amounts in excess of their interests in the property, they changed the finance charge and the total amount of indebtedness, extended new and additional credit through force-placed insurance charges, and thus created a new debt obligation. Under TILA, Carrington and Fay was then required to provide a new set of disclosures showing the amount of the insurance charges (i.e. finance charges) and all components thereof.   On information and belief, to the extent a borrower cannot pay the expense up front, Carrington and Fay increase the principal amount under Plaintiffs' and Class Member's mortgages when they force-placed the insurance, which was a new debt obligation for which new disclosures were required.

174.    Carrington and Fay adversely changed the terms of Plaintiffs' loans after origination in order to allow a kickback on the force-placed insurance charges. These kickbacks are not authorized in the mortgage in any clear and unambiguous way. Carrington and Fay never disclosed to borrowers the amount of the "commissions," "expense reimbursements," or other unearned profits paid to them or their affiliate.

175.    Carrington and Fay also violated TILA by adversely changing the terms of

49

Plaintiffs' loans after origination by requiring and threatening to force-place more insurance than necessary to protect their interest in the property securing the mortgages.

176.     Acts constituting violations of TILA occurred within one year prior to the filing of the original Complaint in this action, or are subject to equitable tolling because Carrington's and Fay's kickbacks, reinsurance, and other unearned revenue-generating scheme was the subject of secret agreements among them and their affiliates and was concealed from borrowers.

177.     Plaintiffs and Class members have been injured and have suffered a monetary loss arising from Carrington's and Fay's violations of TILA.

178.     As a result of Carrington's and Fay's TILA violations, Plaintiffs and Class members are entitled to recover actual damages and a penalty of $500,000.00 or 1% of these Defendants' net worth, as provided by 15 U.S.C. § 1640(a)(1)-(2).

179.     Plaintiffs and Class members are also entitled to recovery of attorneys' fees and costs to be paid by Carrington and Fay, as provided by 15 U.S.C. § 1640(a)(3).

**WHEREFORE**, Plaintiffs, on behalf of themselves and all Class members similarly situated, seeks a judgment in their favor against Carrington and Fay awarding actual damages and a penalty of $500,000.00 or 1% of Carrington's net worth, as provided by 15 U.S.C. §1640(a)(1)-(2), as well as of attorneys' fees and costs to be paid by Carrington and Fay, as provided by 15 U.S.C. § 1640(a)(3).

## COUNT VIII

### Violation of RICO, 18 U.S.C. § 1962(c)
### (Plaintiffs Strickland and Masters against All Defendants on behalf of the Nationwide Carrington Class and Plaintiff Jackson on behalf of the Nationwide Fay Class)

180.     Plaintiffs re-allege and incorporate paragraphs 1-116 above as if fully set forth herein and further allege as follows.

181.     At all relevant times, Defendants were employed by and associated with an illegal

50

enterprise, and conducted and participated in that enterprise's affairs, through a pattern of racketeering activity consisting of numerous and repeated uses of the interstate mails and wire communications to execute a scheme to defraud, all in violation of RICO, 18 U.S.C. § 1962(c).

182.    The RICO enterprise which engaged in and the activities of which affected interstate and foreign commerce, was comprised of an association in fact of entities and individuals that included Carrington, Fay, American Modern, Southwest and their affiliates.

183.    The members of the RICO enterprise had a common purpose: to increase and maximize their revenues by forcing Plaintiffs and Class members to pay inflated amounts for force-placed insurance through a scheme that inflated such amounts to cover kickbacks and expenses associated with servicing Carrington's or Fay's entire loan portfolio, and concealing from Plaintiffs and Class members the true nature of those charges. Defendants shared the bounty of their enterprise by sharing the illegal profits generated by the joint scheme.

184.    The RICO enterprise functioned over a period of years as a continuing unit and maintained an ascertainable structure separate and distinct from the pattern of racketeering activity.

185.    Carrington, Fay, Southwest, and American Modern conducted and participated in the affairs of this RICO enterprise through a pattern of racketeering activity that projects into the future, lasted more than one year, and that consisted of numerous and repeated violations of federal mail and wire fraud statutes, which prohibit the use of any interstate or foreign wire or mail facility for the purpose of executing a scheme to defraud, in violation of 18 U.S.C. §§ 1341 and 1343.

186.    Carrington, Fay, Southwest, and American Modern directed and controlled the enterprise as follows:

> a.    American Modern and Southwest specifically developed and implemented guidelines and standards for the timing and content of the cycle of deceptive letters sent to borrowers about force-placed insurance, to which Carrington and Fay agreed;

10C5717

b.      American Modern and Southwest drafted the language of the fraudulent letters and correspondence to borrowers that was specifically designed to deceive borrowers into believing that they were coming from Carrington or Fay.   The letters   fraudulently misrepresented the true "cost" of the insurance forced on their properties, and these letters were approved by Carrington or Fay;

c.      American Modern and Southwest ran the day-to-day operations of the force-placed scheme by, *inter alia*, tracking Carrington's or Fay's portfolio, mailing a cycle of form letters to borrowers notifying them that insurance coverage would be forced, and misrepresenting to borrowers both that they would be charged only the costs of coverage and that an agency would be paid a fee as compensation for securing an individual policy;

d.      American Modern and Southwest paid kickbacks and provided below-cost mortgage servicing functions to Carrington or Fay and its affiliates to maintain Defendants' exclusive relationship and keep their force-placed scheme moving forward;

e.      Southwest paying the Carrington Kickback to Carrington;

f.      by directing, controlling, and creating an enterprise and arrangement by which Carrington or Fay would receive unearned kickbacks;

g.      by directing, controlling, and creating an enterprise and arrangement by which Carrington or Fay would receive illegitimate revenues (ultimately charged to borrowers) in the form of direct payments, reinsurance, expense reimbursements, or credits that were merely bribes to keep the exclusive relationship and not disclosing same to borrowers;

h.      by directing, controlling, and creating an enterprise and program by which Carrington or Fay received rebates on the cost of the insurance but never charged the borrowers its actual or effective cost to procure the lender placed policies;

i.      by designing and directing an exclusive arrangement by which Defendants manipulated the force-placed insurance market in order to artificially inflate the amounts they charge to borrowers for force-placed insurance.   The charges were inflated to provide Carrington and Fay with kickbacks disguised as "commissions" or expense reimbursements, or to cover the cost of discounted mortgage servicing, and/or to provide Carrington and Fay with lucrative debt forgiveness or reinsurance payments.  American Modern and Southwest benefited by securing business from Carrington and Fay— they provide kickbacks to Carrington and Fay at the expense of the borrowers who are charged the inflated charges;

52

      j.      by developing and implementing guidelines and criteria to determine when force-placed insurance is placed on a borrower's home, in what amount, for what coverages and for what period of time—all of which resulted in inferior and more expensive insurance that covered time periods where no claims were made and/or resulted in "double coverage;" and

      k.      by developing and implementing an automated system to send the cycle of deceptive letters to borrowers, to determine the type, time period and amount of substandard and unnecessary coverage, and to remove or charge borrowers' escrow accounts automatically for improper and inflated charges.

187.    In order to further their control and direction of the enterprise, American Modern and Southwest paid bribes and kickbacks to Carrington in the form of the Carrington Kickback, and to Fay and Carrington in the form of unearned commissions, direct payments, expense reimbursements, reinsurance payments, and below cost mortgage servicing.

188.    As part of and in furtherance of the scheme to defraud, Defendants made numerous material omissions and misrepresentations to Plaintiffs and Class members with the intent to defraud and deceive Plaintiffs and Class members.

189.    For example, American Modern and Southwest, with the approval of Carrington and Fay, sent form letters to Plaintiffs on Carrington or Fay letterhead through the U.S. Mail, stating that Carrington or Fay would purchase force-placed coverage if voluntary insurance was not secured by a certain date.  Specifically, these Defendants represented in the letters to Plaintiffs, which Plaintiffs received, that Carrington would "buy" the required coverage that would cost the Plaintiffs Strickland and Masters $1,378.44 annually.  In making these statements, Defendants knowingly and intentionally falsely stated that the amounts for force-placed insurance that Plaintiffs were charged represented the actual cost of the policies, when in fact Carrington and Fay paid less for the insurance due to the inclusion of the kickbacks and other costs paid as bribes to Carrington and Fay.  Defendants engaged in similar conduct as to all class members.

10C5717

190.     Defendants also knowingly and intentionally fostered the mistaken impression that Carrington and Fay were actively "obtaining" a policy for the borrower when in fact no work was done and no expenses were incurred by Carrington or Fay or their affiliates because a master policy was already in place and the force-placed insurance was issued pursuant to the Defendants' automated procedures.

191.     Indeed, none of the letters sent to Plaintiffs disclosed the financial arrangement between the Defendants.

192.     Defendants had a duty to correct these misstatements and mistaken impressions. These misrepresentations and omissions were material, as they helped Defendants advance their scheme to charge Plaintiffs unreasonably high amounts for force-placed insurance and were designed to lull Plaintiffs and the class into believing that the charges were legitimate.

193.     Plaintiffs and other homeowners would not have paid, or would have contested these specific charges had Defendants disclosed that the illegal bribes and kickbacks were included and that Carrington and Fay were effectively paying less for the force-placed insurance than what it charged to Plaintiffs and the Class members.  Letters such as these were received by Plaintiffs Strickland and Masters dated August 9, 2014, September 10, 2014, and September 28, 2014.

194.     American Modern and Southwest with the approval of Carrington and Fay on Carrington or Fay letterhead, also sent Plaintiffs and the Class members force-placed insurance notices informing them that force-placed insurance had been purchased.  The letters represented that monthly mortgage payments will be increased to include the costs of the policies or that the escrow account will be charged for the premiums that are paid. Thus, Defendants knowingly and intentionally fostered the mistaken impression that the amounts for force-placed insurance that Plaintiffs and class members were charged represented the true cost of the force-placed coverage. In fact, the amounts charged to Plaintiffs were less than what Carrington or Fay actually paid for

54

10C5717

the insurance coverage because they included the Carrington Kickback, "commissions," reinsurance profits, direct payments, "expense reimbursements," below-cost administrative services and other compensation returned to Carrington and Fay but not passed on to Plaintiffs or the borrowers.  Letters such as these were received by Plaintiffs Strickland and Masters dated August 9, 2014, September 10, 2014, and September 28, 2014.

195.    The omission was material, as it gave Defendants a colorable reason to charge Plaintiffs unreasonably inflated amounts for insurance and would have influenced Plaintiffs' decisions whether to pay the charges or contest them.  Plaintiffs would not have paid or would have contested the charges for force-placed insurance had they known that the amounts charged to them were more than what Carrington or Fay paid for the insurance or included kickbacks to Carrington and Fay.  Letters such as these were received by Plaintiffs Strickland and Masters dated August 9, 2014, September 10, 2014, and September 28, 2014.

196.    For the purpose of executing the scheme to defraud, Defendants sent, mailed, and transmitted, or caused to be sent, mailed, or transmitted, in interstate or foreign commerce numerous materials, including but not limited to the notices and letters described above informing Plaintiffs and Class members that they could charge Plaintiffs and Class members unreasonably high amounts for force-placed insurance.  This scheme to defraud proximately injured Plaintiffs and the Class because it prevented them from making an informed decision regarding whether to dispute or pay the force-placed charges, or whether to allow new coverage to be placed on their property.  Had they known that the charges had been artificially inflated to include kickbacks and other improper charges, they would not have paid them or would have contested them.  Defendants also transferred sums among themselves, including but not limited to "fees," or "commissions" to Southwest to cover the below-cost mortgage servicing functions it provided in furtherance of their scheme to defraud Plaintiffs and Class members, in violation of the wire fraud statutes.

10C5717

197.    By reason and as a result of Defendants' conduct and participation in the racketeering activity alleged herein, Defendants have caused damages to Plaintiffs and Class members in the form of unreasonably high force-placed insurance premiums.

**WHEREFORE**, Plaintiffs and Class members seek compensatory damages, treble damages, and attorneys' fees and costs, pursuant to 18 U.S.C. § 1964(c).

<u>COUNT IX</u>

<u>Violation of RICO, 18 U.S.C. § 1962(d)</u>
<u>(Plaintiffs Strickland and Masters against all Defendants on behalf of the Nationwide Carrington Class and Plaintiff Jackson on behalf of the Nationwide Fay Class)</u>

198.    Plaintiffs re-allege and incorporate paragraphs 1-116 and 181-197 herein as if fully set forth herein.

199.    At all relevant times, Defendants were associated with the enterprise and agreed and conspired to violate 18 U.S.C. § 1962(d).  Defendants agreed to conduct and participate, directly and indirectly, in the conduct and affairs of the enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(d).

200.    Carrington, Fay, Southwest, and American Modern illegally agreed to violate RICO, 18 U.S.C. § 1962(d), by, *inter alia*:

- Through Southwest, agreeing that American Modern would be Carrington's and Fay's exclusive force-placed insurance provider and would extract unreasonably inflated amounts from Carrington's and Fay's customers.  Defendants also agreed that American Modern and Southwest would pay kickbacks to Carrington and Fay or their affiliates;

- Agreeing that Southwest and American Modern would administer the LPI program and monitor Carrington's and Fay's mortgage portfolios for lapses in voluntary insurance and would, with the approval of Carrington and Fay, send misleading notices to borrowers.  These misleading notices would inform the borrowers that if new coverage were not procured, coverage would be force-placed, the borrower would be charged the "cost" of the insurance" and earned "commissions" payments would be paid to a Carrington or Fay affiliate;

56

- Entering into an agreement to pay the Carrington Kickback;

- Entering into illusory commission, reinsurance, or outsourcing agreements in order to disguise the true nature of the amounts charged to borrower under the guise of force-placed insurance; and

- Agreeing to commit two or more predicate acts as described above in Count XI.

201.   Through "soft-dollar" or other credits, or cash payments Carrington or Fay affiliates, or Southwest, pass profits from this scheme to Carrington and Fay.

202.   Defendants committed and caused to be committed a series of overt acts in furtherance of the conspiracy and to affect the objects thereof, including but not limited to the acts set forth above.

203.   As a result of Defendants' violations of 18 U.S.C. § 1962(d), Plaintiffs and Class members suffered damages in the form of unreasonably high force-placed insurance premiums.

**WHEREFORE,** Plaintiffs and Class members seek compensatory and treble damages, and attorneys' fees and costs, pursuant to 18 U.S.C. § 1964(c).

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, on behalf of themselves and all similarly situated individuals, demand judgment against Defendants as follows:

1)   Declaring this action to be a proper class action maintainable pursuant to Rule 23(a) and Rule 23(b)(1) and (2), or Rule 23(b)(3) of the Federal Rules of Civil Procedure and declaring Plaintiffs and their counsel to be representatives of the Classes sought in this complaint;

2)   Enjoining Defendants from continuing the acts and practices described above;

3)   Awarding damages sustained by the Strickland, Masters, and Jackson Plaintiffs and the Class members as a result of Carrington's and Fay's breaches of the subject mortgage contracts and the implied covenant of good faith and fair dealing, together with pre-judgment interest;

10C5717

4)      Awarding Plaintiffs Strickland and Masters and the Florida Subclass damages, injunctive relief, declaratory relief, attorneys' fees, and costs under FDUTPA;

5)      Awarding damages sustained by Plaintiffs and the Class members as a result of the American Modern's and Southwest's tortious interference with the mortgage agreements;

6)      Finding that Carrington, Fay and American Modern have been unjustly enriched and requiring them to refund all unjust benefits to Plaintiff and the Class, together with pre-judgment interest;

7)      Awarding Plaintiffs and Class members costs and disbursements and reasonable allowances for the fees of Plaintiffs' and the Classes' counsel and experts, and reimbursement of expenses;

8)      Awarding actual damages and a penalty of $500,000 or 1% of Carrington's and Fay's net worth as provided by 15 U.S.C. § 1640 (a)(1)-(2), and attorneys' fees and costs as provided by 15 U.S.C. § 1640 (a)(3);

9)      Awarding compensatory and treble damages, and attorneys' fees and costs under the federal RICO statute; and

10)     Awarding such other and further relief the Court deems just and equitable.

58

10C5717

## DEMAND FOR JURY TRIAL

Plaintiffs and the Class request a jury trial for any and all Counts for which a trial by jury is permitted by law.

Respectfully submitted this 18th day of December, 2016.

By: /s/ Adam M. Moskowitz

| | |
|---|---|
| Adam M. Moskowitz, Esq.<br>amm@kttlaw.com<br>Thomas A. Tucker Ronzetti, Esq.<br>tr@kttlaw.com<br>Rachel Sullivan, Esq.<br>rs@kttlaw.com<br>Robert J. Neary, Esq.<br>rn@kttlaw.com<br>**KOZYAK, TROPIN, &<br>THROCKMORTON P.A.**<br>2525 Ponce de Leon Blvd., 9th Floor<br>Coral Gables, FL 33134<br>Telephone:  (305) 372-1800<br>Facsimile:   (305) 372-3508<br>*Counsel for Plaintiffs* | Aaron S. Podhurst, Esq.<br>apodhurst@podhurst.com<br>Peter Prieto, Esq.<br>pprieto@podhurst.com<br>John Gravante, III, Esq.<br>jgravante@podhurst.com<br>Matthew Weinshall<br>mweinshall@podhurst.com<br>**PODHURST ORSECK, P.A.**<br>SunTrust International Center<br>One S.E. 3rd Ave., Suite 2700<br>Miami, Florida 33131<br>Telephone: 305-358-2800<br>Facsimile: 305-358-2382<br>*Counsel for Plaintiffs* |
| Lance A. Harke, P.A.<br>lharke@harkeclasby.com<br>Sarah Engel, Esq.<br>sengel@harkeclasby.com<br>Howard M. Bushman, Esq.<br>hbushman@harkeclasby.com<br>**HARKE CLASBY & BUSHMAN LLP**<br>9699 NE Second Avenue<br>Miami Shores, Florida 33138<br>Telephone:     (305) 536-8220<br>Facsimile:      (305) 536-8229<br>*Counsel for Plaintiffs* | |

10C5717